**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| OPTIONS UNLIMITED RESEARCH CORP., | : |
| | : |
| *Plaintiff*, | : Case No. 1:21-cv-192 |
| | : |
| vs. | : Judge Jeffery P. Hopkins |
| | : |
| WESTERN & SOUTHERN FINANCIAL GROUP, INC., | : |
| | : |
| *Defendant*. | : |

**OPINION AND ORDER**

Defendant Western & Southern Financial Group, Inc. (W&S) moves to dismiss Plaintiff Options Unlimited Research Corp.'s (d/b/a Savvysoft) Complaint (Doc. 3) for failure to state a claim upon which relief can be granted. W&S argues that all of Savvysoft's claims fail because they are time-barred, insufficiently pleaded, or both. For the reasons below, the Court finds that, based on the facts alleged in the Complaint, which is all that the Court can consider at this juncture, Savvysoft's claims are timely and well-pleaded. Accordingly, the Court **DENIES** W&S's Motion to Dismiss all Claims (Doc. 13).

## I. BACKGROUND

This is a software dispute. Plaintiff Savvysoft is a "provider of derivatives software products for the institutional market." Doc. 3, ¶ 9. Among its products is a program called TurboExcel (also marketed as Calc4Web), which converts Excel spreadsheets into C++ coded programs that can run independent of Excel. *Id.* at ¶¶ 11, 18. That program, according to Savvysoft, is "extremely popular in the financial services industries" and was widely used

by businesses including "banks, investment firms, and insurance companies"—Defendant W&S included. *Id.* at ¶¶ 19, 24.

Indeed, W&S was exactly the type of business for which Savvysoft created TurboExcel. W&S offered "numerous types of life and disability insurance," which required it to quote premiums. *Id.* at ¶ 23. Those quotations "requir[ed] making complex calculations based upon variables received from [potential customers] like age, weight, [and] smoking status." *Id.* Until TurboExcel came along, W&S performed those complex calculations on a customer-by-customer basis, "using customer variables fed into Excel spreadsheets." *Id.* at ¶¶ 20, 23. But that process was inefficient. It required W&S's underwriters and actuaries to manually input customer variables into spreadsheets to generate insurance price quotes, a process that became untenable as "[t]he company experienced a surge of growth in the 1990s." *See id.* at ¶¶ 21–22. To keep up with demand, maintain the security of its proprietary algorithms, and keep costs down, "[W&S] needed a technology solution that would automate [this process]." *Id.* at ¶¶ 23–24.

That "technology solution" was TurboExcel. It translated W&S's proprietary Excel spreadsheets into C++ object code, which could be distributed to and "used by field agents by simply plugging in customer variables to obtain instant accurate quotes based upon the same underwriting criteria used in the home office." *Id.* at ¶ 24. More specifically, TurboExcel relied on two kinds of object code files: Generated Files and Runtime Files. Software Licensing Agreement, Doc. 3-2, PageID 21. Generated Files are the object code translations of the initial Excel spreadsheets. Runtime Files are object code files that Savvysoft provided (i.e., these files were not generated from the user's Excel sheets) that included subroutines that the Generated Files could use for performing various calculations. Both file types were in the

2

form of C++ object code, not source code.[1] That matters because, while humans can easily read formulas in Excel spreadsheets, they can't read object code. *See* Doc. 3, ¶ 24. As a result, W&S could safely distribute the object code files to its over-82,000 field agents, without fear of someone learning its proprietary pricing formulas. *Id.* at ¶¶ 22, 24. Gone were the days of W&S's underwriters at the home office laboriously plugging figures into spreadsheets.

But the story wasn't entirely rosy. Instead, according to the allegations, trouble began brewing from the very outset of the parties' relationship. W&S bought its license to use TurboExcel from Savvysoft in 2005. But it opted to purchase the least expensive—and most limited—license that Savvysoft offered. *See id.* at ¶¶ 25–29. The terms of that license are set out in the SLA attached to the Complaint. Doc. 3-2. The SLA imposed two restrictions relevant to this dispute. First, W&S could only install TurboExcel on a single computer, and could only use it to convert Excel spreadsheets that were also "substantially created" on that single computer. *Id.* at ¶ 32. Second, W&S could not distribute "the Runtime Files … without a valid copy of the Generated Files," and the Generated Files, as noted above, could only be used on the licensed computer (i.e., the computer on which W&S had installed TurboExcel and on which the underlying Excel spreadsheet was substantially created). *Id.* at ¶ 33. In short, W&S purchased an extremely limited license.

––––––––––––––––––––

[1] Object code refers to code that has been compiled, which is the process that renders it ready for implementation on a microprocessor. Office of Technology Assessment, OTA-TCT-527, *Finding a Balance: Computer Software, Intellectual Property, and the Challenge of Technological Change* 13, 18 nn.29, 59 (1992) [hereinafter *OTA Report*]; *see also Syntek Semiconductor Co. v. Microchip Tech. Inc.*, 307 F.3d 775, 779 (9th Cir. 2002). Source code, on the other hand, refers to code before it has been compiled. *OTA Report* at 13, 18 nn.29, 59. Source code can easily be read and understood, at least by programmers who know the computer language at issue (here C++). *Id.* at 18 nn.57–59; *see also Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1539 n.17 (11th Cir. 1996). Object code, by contrast, cannot. *See Bateman*, 79 F.3d 1539 n.17. Or at least it cannot absent being decompiled back into source code. *OTA Report* at 7.

Savvysoft informed W&S of the limitations of its license in 2005, when W&S first purchased the software. *Id.* at ¶ 27. Despite that explanation and the license limitations, W&S used TurboExcel to create its "Quote System." *Id.* at ¶ 29. That Quote System operated along the lines described above. Basically, W&S employees used TurboExcel to convert W&S's proprietary Excel spreadsheet underwriting calculations (spreadsheets that had been created on a variety of different computers) into Generated Files, and W&S then distributed those files to its field agents (with the Runtime Files) to use in providing real-time quotes to customers. *See id.*

Savvysoft did not learn of W&S's unlicensed use until "early 2018," when a W&S employee reached out with a technical service request. *Id.* at ¶ 31. At that point, Savvysoft learned that W&S installed TurboExcel on a "central computer that was being used . . . to convert spreadsheets created by numerous different actuaries . . . on other computers in violation of the [SLA]." *Id.* Because of that alleged misuse, Savvysoft refused to renew W&S's license key, a key that W&S needed to update annually so the software would continue working. *Id.* at ¶¶ 30, 36. While Savvysoft's denial of the license key meant that W&S was unable to use TurboExcel to generate any *new* files, W&S nonetheless "continued to use and distribute the Runtime Files [previously] generated by TurboExcel without a valid copy of the Generated Files as part of the [W&S] Quote System." *Id.* at ¶ 36.

Three years later, in 2021, Savvysoft sued W&S for exceeding the terms of the software license between the two. Doc. 3. It seeks relief on three theories: breach of contract for violating the SLA's terms, copyright infringement for distributing the Runtime Files, and misappropriation of trade secrets for the same distribution. *Id.* W&S moved to dismiss all

those claims. Doc. 13. Savvysoft responded, Doc. 17, and W&S replied, Doc. 19, so the matter is ripe.

## II.    STANDARD OF REVIEW

W&S seeks to dismiss the Complaint for failure to state a claim under Rule 12(b)(6). A party may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must include "only enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). This, however, requires "more than labels and conclusions [or] a formulaic recitation of the elements of a cause of action." *Id.* at 555. Rather, the Complaint must include factual allegations, and those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Put differently, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable interference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Under this standard, which the Supreme Court set out in *Twombly* and *Iqbal*, courts play an important gatekeeper role, ensuring that claims meet a plausibility threshold before defendants are subjected to the potential rigors (and costs) of the discovery process. "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim, but rather a process for discovering evidence to substantiate plausibly-stated claims." *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio Nov. 30, 2020).

In deciding a motion to dismiss, the district court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007).

In doing so, the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Gregory v. Shelby County,* 220 F.3d 433, 446 (6th Cir. 2000).

## III.   LAW AND ANALYSIS

In its motion to dismiss, (Doc. 13), W&S attacks each of Savvysoft's three theories. Specifically, W&S argues that (1) the breach of contract claim is untimely; (2) the copyright infringement claims are untimely and fail to sufficiently allege the required elements; and (3) the trade secret claims fail for inability to plausibly allege any specific trade secret. In sum, as to each claim, W&S presses either a statute of limitations argument, an argument on the merits, or both. For the reasons discussed below, all those arguments fail to carry the heavy burden required to warrant dismissal of Savvysoft's claims at this stage of the litigation.

### A. Breach of Contract Claim

The SLA—a contract—structured Savvysoft's relationship with W&S. Savvysoft claims W&S breached that contract. Doc. 3, ¶¶ 65–68. W&S, for its part, does not argue that Savvysoft failed to plead sufficient facts alleging breach. Instead, it argues that the applicable statute of limitations bars the breach of contract claim. Doc. 13, PageID 63–65. Accordingly, that is the only argument the Court addresses. In resolving the statute of limitations question, the Court assumes—without deciding—that the facts here constitute breach.

### i.      Choice of Law

The Court must first determine what the statute of limitations *is*. To do that, the Court must determine which state's law governs the contract. Fortunately, the SLA expressly answers that question. It provides that the contract is to be "governed and interpreted in accordance with the laws of the State of New York," meaning that New York's statute of

limitations will apply to breach of contract claims. Doc. 3-2, PageID 23.[2] Even so, the Court must itself "evaluate choice of law . . . because, after all, what law the Court must apply as a rule of decision is an issue antecedent to . . . resolving the merits of the dispute before it." *Shanghai Weston Trading Co., Ltd. v. Tedia Co., LLC*, 707 F.Supp.3d 737, 744 n.5 (S.D. Ohio 2023) (cleaned up). The Sixth Circuit instructs district courts exercising federal question jurisdiction—as in this case—to "follow the choice of law rules of the forum state" with respect to state-law claims heard under that court's supplemental jurisdiction. *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136 (6th Cir. 1996). Therefore, Ohio's choice-of-law rules determine the choice of substantive law here. And under Ohio law, contractual choice-of-law provisions are binding "unless the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Dawson v. Allstate Vehicle & Property Insurance Co.*, 709 F.Supp.3d 444, 449 (S.D. Ohio Jan. 2, 2024) (cleaned up). Such a "substantial relationship" is readily apparent here: Savvysoft is a New York corporation with its principal place of business in New York. Doc. 3, ¶ 7; *see Contech Const. Prods., Inc. v. Blumenstein*, 2012 WL 2871425 at *9 (S.D. Ohio July 12, 2012) (observing that contracting party's domicile in a state qualifies as a "substantial relationship" to that state for conflict-of-laws purposes). Therefore, this Court will hew to the parties' agreement to subject the SLA to New York law.

---

[2] The SLA also contains a forum-selection clause specifying that "any cause of action arising under this Agreement shall be brought in a court in New York." Doc. 3-2, PageID 23. Needless to say, this Court is not in New York. Even so, the Court does not comment on any potential impact that clause might have on this dispute, as neither party invoked the clause in its arguments.

ii.     **Statute of limitations**

As New York's law governs the SLA, three questions follow. First, what is the statute of limitations period for breach of contract under New York law? Second, did Savvysoft file this suit within that period? And third, if Savvysoft did not timely file, does some exception to the limitations period nonetheless allow this claim to proceed?

The first question is easy. New York's statute of limitations for breach of contract claims is six years. *Combs v. International Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) (citing N.Y. Civ. Prac. L. & Rules § 213); *Town of Oyster Bay v. Lizza Industries, Inc.*, 4 N.E.3d 944, 947 (N.Y. 2013). Since New York does not apply the "discovery rule" to its statute of limitations, the six-year period commences at the time of breach "even though the injured party may be ignorant of the existence of the wrong or injury." *ACE Securities Corp. v. DB Structured Prods., Inc.*, 36 N.E.3d 623, 628 (N.Y. 2015).

The second question is similarly straightforward. Savvysoft admits that the six-year clock starts "when the contract is first breached," and that the first breach they allege here occurred "over sixteen years ago." Doc. 19, PageID 168. So simple arithmetic bears out W&S's argument that "the claim for breach of contract [was] out of time by ten years." Doc. 13, PageID 65 (emphasis omitted).

But the third question—whether an exception to the limitations period applies—is where the parties' real dispute lies. In the face of W&S's otherwise correct argument that its claim is time-barred, Savvysoft invokes an exception to New York's statute of limitations: the continuing wrong doctrine. That doctrine applies to contract claims "when the contract imposes a continuing duty on the breaching party." *Garron v. Bristol House, Inc.*, 162 A.D.3d 857, 859 (N.Y. App. Div. 2018). But, while described as a "continuing wrong" doctrine, it is

8

perhaps better understood as a "continuing series of wrongs" doctrine. Indeed, *Garron* itself goes on to explain that a "series of continuing wrongs … toll[s] the running of a period of limitations to the date of the commission of the last wrongful act." *Id.* at 858–59. That is, the doctrine seems to recognize that each of a continuing series of separate breaches can give rise to a new cause of action. A state-court opinion illustrates: in a case involving a contract between an insurance company and its customers, which required the former to reconsider its premiums every five years to reflect changed conditions, the court found that the recurring reconsideration requirement constituted a "continuing duty," such that "the plaintiff's claim for damages accrued each time the defendant allegedly breached [that] obligation[]." *Beller v. William Penn Life Ins. Co.*, 8 A.D.3d 310, 313–14 (N.Y. App. Div. 2004). Importantly, though, the court made clear that any claims premised on reconsiderations that had occurred more than six years before the plaintiff brought suit were time-barred. *Id.*; *see also Garron*, 162 A.D.3d at 859. In other words, the continuing wrong doctrine does not *resurrect* time-barred claims, but rather, applies when the complained-of breach is really comprised of a series of distinct breaches, some of which fall within the limitations period and are therefore timely. The doctrine merely allows the plaintiff to proceed on the later breaches—those that occurred within the limitations period. *See Westchester Cnty. Correction Officers Benevolent Ass'n, Inc. v. Cnty. of Westchester*, 65 A.D.3d 1226, 1228 (N.Y. App. Div. 2009). In a sense, it is merely a kind of non-waiver provision. The plaintiff's failure to complain about the earlier breaches does not preclude it from pursuing a claim based on the later ones.

Turn to the facts of this case. Applying the continuing wrong doctrine here requires two inquiries: (1) whether the SLA imposed a "continuing obligation," and if so, (2) whether the plaintiff's claim is "predicated on continuing unlawful acts and not on the continuing

9

effects of earlier unlawful conduct." *Henry v. Bank of America*, 147 A.D.3d 599, 601 (N.Y. App. Div. 2017).

Start with the first prong—whether the SLA imposed a "continuing obligation." The Court is satisfied that Savvysoft has plausibly alleged that it does. As Savvysoft points out in its response to the motion to dismiss, various SLA provisions impose continuing duties on W&S as a licensed user of TurboExcel. Doc. 17, PageID 126–27. And since the SLA is referenced thoroughly and attached to the Complaint, each of those obligations is pleaded sufficiently to survive a motion to dismiss. *See* Doc. 3-2. The first continuing obligation is the "continuing duty to only use TurboExcel on [a] single computer . . . and to limit [its] use to processing of only files created on that same computer." Doc. 17, PageID 126. The second is the "restric[tion] . . . from distributing the Generated files and Runtime files on an ongoing basis." *Id.* Certain other provisions are worded in continuous terms, too, but are irrelevant to Savvysoft's claim of breach and therefore not under consideration here. *See id.* at PageID 127 nn.2–4.

Move to the second prong—whether the complained-of conduct is a "series of individual [breaches]," or a single breach causing increasing damages over time. *CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 195 A.D.3d 12, 18–19 (N.Y. App. Div. 2021). If the latter, the continuing wrong doctrine does not apply since there is no "wrongful act[]" within the limitations period. *Id.*; *Garron*, 162 A.D.3d at 859. In a sense, this prong asks whether the breaching party made a new and subsequent decision that amounted to a breach, or rather whether the plaintiff is continuing to suffer increasing harms from a single previous decision. This case, as alleged, involves the former, not the latter. In its Complaint, Savvysoft sufficiently pleaded a series of individual wrongs based on W&S's use of TurboExcel to

implement a "quoting solution for their agents that they called their 'Quote System.'" Doc. 3, ¶ 29. As described above, that system essentially included two steps. First, W&S would convert Excel spreadsheets created on multiple computers by multiple actuaries into C++ using a copy of TurboExcel set up on a central computer. *Id.* at ¶ 31. After that, W&S would send both the Generated and Runtime Files to insurance agents in the field to use when quoting policies for customers. *Id.* at ¶¶ 28–39; Doc. 17, PageID 126–30. Every time W&S allegedly elected to convert a spreadsheet on the central computer hosting TurboExcel, it independently breached its obligation to use TurboExcel only to convert spreadsheets substantially created on that computer. And every time it allegedly distributed the Generated and Runtime files to field insurance agents, it likewise independently breached its non-distribution obligation. Thus, each such instance gave rise, under New York law, to a potential "new claim, with a new limitations period." *CWCapital*, 195 A.D.3d at 18.

W&S argues it breached the SLA—if at all—only once: in 2005, when W&S became bound by the SLA's terms. Doc. 19, PageID 170–71. That single breach amounted only to a "failure to purchase the correct number of licenses" at the outset of the parties' relationship. *Id.* at PageID 171 (cleaned up). W&S concedes that the damages Savvysoft suffered increased every time W&S failed to pay for the pricier license that would have authorized its use-case, but it insists that the breach *itself* occurred only once. *See id.* at PageID 170. Stated differently, according to W&S, Savvysoft's cause of action for breach of contract accrued a single time, in 2005, even though the damages caused by that single breach increased over time. So there was no continuing *wrong*, even though there were continuing *damages*.

That argument fails to persuade. First, it relies on a factual account contrary to Savvysoft's allegations—allegations that this Court must accept as true on a motion to

dismiss. Savvysoft did not plead its breach of contract claim solely based on W&S's failure to purchase the software license it *should* have bought (though that fact is also adequately pleaded, *see* Doc. 3, ¶ 28). Rather, it alleges that W&S repeatedly breached the terms of use of the license it *did* buy. *See id.* at ¶¶ 30–37.

Second, W&S's argument relies on analogies to distinguishable, non-binding, and ultimately unpersuasive case law. It leans most heavily on *Fioranelli v. CBS Broadcasting Inc.*, 551 F.Supp.3d 199 (S.D.N.Y. 2021), a federal court case interpreting New York law. There, the plaintiff was a photojournalist who captured early footage of Ground Zero after the 9/11 attacks and granted CBS a license to use that footage in its broadcasts (but not to sublicense it to others). *Id.* at 208–10. Subsequently, CBS entered into three agreements allowing other entities to use CBS's footage (including the plaintiff's), and, more importantly, to sublicense that footage to third parties. CBS entered two such agreements with the BBC in 2002 and 2006, and one with T3 in 2013. *Id.* at 256. After plaintiff discovered third parties airing his footage, he sued CBS in 2015, alleging that those three agreements together constituted an "extensive program of sublicensing" that breached his original licensing agreement with CBS. *Id.* The court found that his claim accrued when that program began in 2002—thirteen years before he filed suit—and was thus time-barred. *Id.* at 257. En route to this holding, the court opined in passing that the continuing wrong doctrine did not toll the limitations period to 2013—the date of the most recent sublicensing agreement. *Id.* at 256. But it is not exactly clear from the opinion *why* the court reached that result. That may be because the parties "[did] not explicitly mention the continuing wrong doctrine" in their briefing, so the court did not have the benefit of briefing on the issue. *Id.* Or perhaps the court relied on the plaintiff's decision

there to describe the alleged breach as a single "program" beginning in 2002, rather than as three separate breaches, with the most recent breach occurring in 2013. *Id.*

If it is the latter, that is not how Savvysoft pleaded its case here. Instead, it alleged that "[W&S's] *continued use* of its single TurboExcel license . . . violat[ed] [] the license agreement," Doc. 3, ¶¶ 30–31 (emphasis added), and that "[W&S *continued* to use [Turbo Excel files] … [in] violation of the terms of the TurboExcel license," *id.* at ¶¶ 36–37 (emphasis added). The Court finds from these statements and all reasonable inferences drawn therefrom that Savvysoft, unlike the plaintiff in *Fioranelli*, alleged a continuing series of individual wrongs—e.g., each conversion of a new Excel spreadsheet using the TurboExcel program— rather than a single wrong resulting in accumulating damages over time. And in any event, whatever the relative merits of *Fioranelli* (a federal case), this Court is bound by New York state courts' understanding of New York law. Under the state-court case law cited above, the allegations here support reliance on the continuing wrong doctrine to permit recovery for breaches that occurred within the six-year period before suit.

In sum, as an initial matter, New York's six-year statute of limitations would appear to bar Savvysoft's breach of contract claim. The cause of action first accrued in 2005, when Savvysoft alleges the first breach occurred. So, as a general matter, the statute of limitations would expire in 2011, long before Savvysoft sued. But, as described above, the continuing wrong doctrine excepts from the statute of limitations "precisely the kind" of claim at issue here: where there is an agreement that imposes a continuing obligation that the defendant has repeatedly breached through independent actions. *BJB Limited v. iStar Jewelry LLC*, 533 F.Supp.3d 83, 92 (E.D.N.Y. 2021). Therefore, the Court declines to dismiss Savvysoft's breach of contract claim, but notes that it may only pursue claims based on breaches that

13

accrued after March 22, 2015, six years before it filed this action. *Westchester Cnty.*, 65 A.D.3d at 1228.

## B. Copyright Claims

Savvysoft brought two copyright claims in its Complaint, one each for direct and indirect infringement. Doc. 3, ¶¶ 40–55. Like before, W&S argues that the relevant statute of limitations bars these claims. Alternatively, W&S urges the Court to dismiss both counts on various substantive grounds. The Court finds none of W&S's arguments convincing.

### i. Statute of Limitations

Start with the statute of limitations. As a general matter, the Copyright Act provides that "[n]o civil action shall be maintained under the [Act] unless it is commenced within three years after the claim accrued." 17 U.S.C. § 507(b). But the three-year period commences—or in other words the claim accrues—only when the aggrieved party *discovers* the infringing activity, not when the activity actually occurred. This is known as the "discovery rule." *Navarro v. Procter & Gamble*, 515 F.Supp.3d 718, 757–60 (S.D. Ohio 2021). That said, while the three-year timer does not begin to run until the plaintiff discovers the violation, damages are limited to those that were incurred during that three-year window. *Id.* at 760–62. In other words, if a plaintiff learned of a fifty-year-old copyright infringement last year, her claim is not time-barred, but she could not recover any damages that she incurred more than three years before filing suit.

How does that play out here? Savvysoft alleged that W&S infringed its copyright in TurboExcel from 2005 to 2018. *See* Doc. 3, PageID 10–11 ¶¶ 28–31. And Savvysoft filed its Complaint on March 22, 2021. *Id.* So if Savvysoft did not discover (and did not have a reasonable basis for discovering) the allegedly infringing activities before March 22, 2018, its

14

claims are timely. Unfortunately, the Complaint identifies the date of discovery imprecisely. Savvysoft claims it learned of W&S's allegedly infringement "in early 2018," when it received a technical inquiry from W&S that tipped it off to the software's unlicensed use—and therefore to the ongoing copyright infringement. *Id.* at PageID 11 ¶ 31.[3] So the issue turns on whether Savvysoft's allegation that it discovered the infringement "in early 2018" is sufficient to overcome the argument that a complaint filed on March 22, 2021, is time barred by a three-year limitations period. The Court finds that the allegation suffices. That is, accepting as true that Savvysoft discovered the infringement "in early 2018," the Court finds it reasonable to infer, at least for present purposes, that this means "on or after March 22, 2018."

W&S urges the Court to reach a different result, largely based on its attachment of extra-pleading correspondence between the parties. *See* Doc. 13, PageID 65 (quoting Doc.13-1, PageID 18). That correspondence appears to include a demand letter from Savvysoft to W&S, dated February 15, 2018, detailing how Savvysoft "learn[ed] of the [infringing activities] in January 2018." Doc. 13-1, PageID 82. Needless to say, January of 2018 falls before March 22, 2018. So if the Complaint's reference to "early 2018" means "January 2018," Savvysoft's copyright infringement claims are indeed time-barred.

---

[3] To be clear, a user of software does not commit copyright infringement simply because they have violated the software licensing agreement. Rather, the unlicensed use must independently constitute copyright infringement. In other words, a license agreement can permit use of software that would otherwise constitute copyright infringement, but it cannot create copyright infringement where none would otherwise exist. The license agreement here does the former. TurboExcel's SLA permits users to copy and distribute Runtime Files as long as they accompany valid Generated Files—an act that could independently constitute copyright infringement if not expressly permitted. When the licensee exceeds the bounds of the license, as is alleged here, the permission no longer ratifies their copying. That is what the Court refers to as "the ongoing copyright infringement."

But the Court cannot consider this information in its current procedural posture. As a general rule, "matters outside the pleadings may not be considered in ruling on a 12(b)(6) motion to dismiss." *In re Fair Fin. Co.*, 834 F.3d 651, 656 n.1 (6th Cir. 2016). A limited exception exists for documents that are "referred to in the pleadings and integral to the claims." *Moyer v. Gov't Emps. Ins. Co.*, 114 F.4th 563, 568 (6th Cir. 2024) (cleaned up). W&S argues that the correspondence attached to its motion clears that high bar, but the Court is unconvinced. The Complaint's allegations fall far short of referring directly to the letters. The portions highlighted by W&S assert only that Savvysoft "advised" W&S of its infringement. Doc. 3, ¶ 35. For all the Court knows, the "advice" referred to could have been conveyed in a different letter than the one attached or even through a different medium entirely, like a phone call. Merely alleging *a* communication in a pleading is a far cry from referring to *the* communication attached by W&S as an extra-pleading document.

For these reasons, the Court declines to dismiss Savvysoft's copyright infringement claims on statute-of-limitations grounds at this time, with two important caveats: (1) Savvysoft's recovery on its copyright infringement claims is limited to damages incurred after the three-year lookback period began, *see Navarro*, 515 F.Supp.3d at 760–62, and (2) the correspondence attached to W&S's motion, if authenticated, can be considered on a motion for summary judgment, and would likely result in dismissal of the copyright claim on timeliness grounds.

## ii.    Direct Copyright Infringement

Savvysoft claims that W&S directly infringed its copyright in TurboExcel. Doc. 3, ¶¶ 40–48. W&S seeks dismissal of that claim, arguing that Savvysoft failed to plausibly allege several required elements of copyright infringement. The Court disagrees.

Article I, Section 8 of the Constitution authorizes Congress to "promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Congress exercised that authority almost immediately, passing an early copyright statute in 1790. *See Burrow-Giles Lithographic Co. v. Sarony*, 111 U.S. 53, 57 (1884). And it didn't stop there. After a separate statutory overhaul in the early 20th century, Congress passed the currently operative Copyright Act in 1976. 17 U.S.C. § 101 *et seq.* (1976).

Start with copyright's scope. The Copyright Act protects "original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Savvysoft's allegations meet every part of that definition. First, an item must be a "work of authorship" to be copyrightable. The statutory definition of that term "embraces computer programs"—like TurboExcel. *SAS Inst., Inc. v. World Programming Ltd.*, 64 F.4th 1319, 1325 (Fed. Cir. 2023). Second, the work must be original. That requirement presents "a low threshold"—all that an author must show is that they "independently created a work with some minimal degree of creativity." *Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC*, 93 F.4th 985, 989 (6th Cir. 2024) (cleaned up). Savvysoft has adequately alleged originality, claiming that TurboExcel "was written and coded . . . entirely by [Savvysoft's founder]." Doc. 3, ¶ 11. And third, it must be fixed in a tangible medium. Computer programs like TurboExcel are fixed in a tangible medium of expression—the written word—so they qualify for copyright protection. *Digital Filing Systems, L.L.C. v. Aditya Intern.*, 323 Fed.Appx. 407, 418 (6th Cir. 2009) ("[C]omputer programs . . . fall under the Act's protection of 'literary works.'"). *See also Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 702 (2d Cir. 1992).

17

Owning a copyright creates certain exclusive rights in the copyrighted material. Those protections do not "accord[] the copyright owner complete control over all possible uses of his work." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 432 (1984). Instead, the copyright consists of six statutorily-identified rights. The three at issue here are: (1) the right to reproduce, (2) the right to prepare derivative works, and (3) the right to distribute. 17 U.S.C. § 106.

"Anyone who violates any of the exclusive rights of the copyright owner . . . is an infringer of the copyright." *Sony*, 464 U.S. at 433; 17 U.S.C. § 501. So, as long as Savvysoft has pleaded a sufficient basis for any of the three relevant grounds for infringement, its direct copyright infringement claim survives W&S's motion to dismiss.

Of the three exclusive rights at issue here, Savvysoft has most clearly made out a case for infringement of its exclusive right to distribute copies of TurboExcel. Infringement of the right to distribute copies is apparent in Savvysoft's allegation that W&S "distribute[d] the Runtime Files generated by TurboExcel without a valid copy of the Generated Files." Doc. 3, ¶ 36. Remember that the Runtime Files are part of the TurboExcel software, and therefore subject to Savvysoft's copyright for the reasons described above. Any distribution of those files, then, is an infringement of its copyright unless authorized. And, as Savvysoft emphasizes throughout its Complaint and response in opposition, W&S's distribution of the Runtime Files "violat[ed] [] the terms of the TurboExcel license agreement." *See, e.g.*, Doc. 3, ¶ 37; *see also Sony*, 464 U.S. at 433 (holding that "anyone who is authorized by the copyright owner to use the copyrighted work in [an otherwise prohibited way] is not an infringer").

Because Savvysoft raised a plausible case for infringement of its exclusive right to reproduce the Runtime Files, the Court need not reach any conclusion on the other two

18

relevant bases for infringement. An adequate showing of just one sufficient basis for a claim is enough to overcome a motion to dismiss.

The Court finds W&S's counterarguments unconvincing for one simple reason: they are directed to material over which Savvysoft never asserted copyright in the first place. Throughout its motion to dismiss, W&S urges the Court to dismiss Savvysoft's claim for copyright infringement because Savvysoft has not "filed for [copyright] registration on W&S's converted files and the related output of the TurboExcel software" and "has no copyrightable interest in those files as they consist of W&S's calculations and algorithms." Doc. 13, PageID 68–69. W&S is talking about the Generated Files—TurboExcel's output after translating Excel sheets into C++ code. And W&S is right: Savvysoft likely has no copyrightable interest in those files, since they are simply translations of W&S's own work—not Savvysoft's. But that is irrelevant, as Savvysoft based its copyright infringement claim on W&S's distribution of the Runtime Files, not the Generated Files. *See* Doc. 3, ¶ 37.

### iii.    Indirect Copyright Infringement

Liability for indirect copyright infringement takes two forms: vicarious infringement and contributory infringement. Since Savvysoft has pleaded the required elements for vicarious infringement, the Court declines to dismiss its claim for indirect copyright infringement.

A person commits vicarious copyright infringement by "profiting from the infringement while declining to exercise a right to stop or limit it." *Broad. Music, Inc. v. Meadowlake, Ltd.*, 754 F.3d 353, 354 (6th Cir. 2014) (cleaned up). The defendant's right to control infringing activity can be established by, among other things, an employer-employee relationship. *See id.* at 354–55; *see also Leonard v. Stemtech Int'l Inc*, 834 F.3d 376, 388 (3d Cir.

2016) ("The requirement that a defendant have the right to supervise or control [includes] . . . relationships such as master-servant or employer-employee."). Savvysoft clearly alleges that "[W&S] *employees* copied [and] used … [TurboExcel] without Savvysoft's authorization." Doc. 3, ¶ 52 (emphasis added). And Savvysoft further substantiated that allegation by describing the alleged operation of W&S's Quote System, going so far as to name *specific* employees at W&S who participated in that system's design and implementation, and therefore in the alleged infringement. *See id.* at ¶ 29. At this stage, those allegations are enough to make out a claim for W&S's vicarious copyright infringement based on its employees' use of TurboExcel.

In fairness, W&S's argument for dismissal centers on Savvysoft's failure to make out a case for *contributory*—not vicarious—infringement. *See* Doc. 13, PageID 67–71. And *that* argument is correct. Contributory infringement occurs when a party "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." *Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 889 (6th Cir. 2004) (quotation omitted). Savvysoft does not allege a single fact to that effect. But that is because its claim, as the Court understands it, is for *vicarious* infringement, not *contributory* infringement. So even though W&S is technically correct, it tilts at windmills in arguing for the dismissal of a claim that Savvysoft never brought.

Because Savvysoft properly pleaded its case for vicarious infringement, the Court declines to dismiss its claim based on W&S's argument that it failed to plead its case for contributory infringement.

### C. Trade Secret Claim

Savvysoft's last claim against W&S is for misappropriation of trade secrets under both the federal Defend Trade Secrets Act (DTSA) and the Ohio Uniform Trade Secrets Act (OUTSA). W&S's argument for dismissal, in brief, is that Savvysoft did not sufficiently plead the existence of a trade secret in TurboExcel. The Court again disagrees.

Before the Court can determine whether a trade secret is plausibly pleaded, "the plaintiff must identify what it is that it believes is the trade secret." *Broad-Ocean Technologies, LLC v. Lei*, 649 F.Supp.3d 584, 591 (E.D. Mich. Jan. 9, 2023). To that end, a plaintiff must define its trade secret with "reasonable particularity." *Caudill Seed & Warehouse Co., Inc. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380–81 (6th Cir. 2022) (quotation omitted). A plaintiff clears this bar if they provide enough information to separate the alleged trade secret "from matters of general knowledge." *Id.* at 381. But blanket allegations "that all information in or about its product is a trade secret" are not enough. *Id.* (cleaned up).

Savvysoft's Complaint clears this initial hurdle, but just barely. Its allegations that "TurboExcel is a trade secret" offer the Court nothing of value and no basis on which to carry out its trade secret analysis. Doc. 3, ¶¶ 57, 62. Luckily for Savvysoft, the SLA attached to the Complaint further specifies that, among other things, "the object code for this software . . . [is a] trade secret[]." Doc. 3-2, PageID 22. And Savvysoft specified further in its response to W&S's motion that its trade secret claims focus on "the continued use and distribution of the Runtime Files." Doc. 17, PageID 138 (quotation omitted). Though the Complaint itself does not spell that out, the Court finds that such a conclusion is, by the thinnest of margins, a reasonable inference from the pleadings when construed in the light most favorable to

Savvysoft. For the remainder of this analysis, then, any reference to Savvysoft's "trade secret" is made with respect to the Runtime Files only.

Having determined the specific information over which Savvysoft asserts trade secret protection, the Court will analyze both the DTSA and OUTSA claims as one for the purposes of this motion. As other courts in this District have noted, plaintiffs alleging misappropriation under DTSA and OUTSA must "show the same three things[:] . . . (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship [or, for DTSA, through some other improper means]; and (3) the unauthorized use of a trade secret." *Mariner Wealth Advisors, LLC v. Savvy Advisors, Inc.*, No. 1:24-cv-351, 2024 WL 3466153, at *5 (S.D. Ohio July 19, 2024) (quotation omitted); *see* 18 U.S.C. § 1839(6) (laying out "improper means" of acquiring a trade secret apart from acquiring it through a confidential relationship). The Court will call these the DTSA/OUTSA prongs. Savvysoft's Complaint makes an adequate showing of all three.

Start with the third DTSA/OUTSA prong: unauthorized use. Savvysoft repeatedly referred to W&S's improper use of TurboExcel. *See, e.g.*, Doc. 3, ¶ 31 ("violation of the license agreement"); *id.* at ¶ 34 ("violated the terms of the TurboExcel license agreement"); *id.* at ¶ 35 (same). And in its response to W&S's motion, Savvysoft emphasized the specific information within TurboExcel's software constituting its trade secret and exactly how W&S misused it. Namely, W&S "us[ed] and distribut[ed] [] 'the Runtime Files generated by TurboExcel without a valid copy of the Generated Files as part of the [W&S] Quote System.'" Doc. 17, PageID 138 (quoting Doc. 3, ¶ 37).

Move to the second DTSA/OUTSA prong: acquisition. Savvysoft can satisfy it by alleging that W&S acquired the trade secret through a confidential relationship. To determine

whether a confidential relationship exists, courts "ask whether [the parties] formed a relationship in which the pair had a duty to maintain the information . . . in utmost secrecy." *Novus Grp., LLC v. Prudential Fin., Inc.*, 74 F.4th 424, 428 (6th Cir. 2023) (quotation omitted). Furthermore, the information constituting the trade secret must have been acquired "*as a result of* [the] confidential relationship." *Mariner*, 2024 WL 3466153, at *5 (emphasis added). The SLA establishes just such a relationship. It prohibited W&S from attempting to "unlock or bypass [TurboExcel's] copy protection[s]," from "reverse engineering, disassembly or decompiling of the software" and from distributing the Runtime Files. Doc. 3, ¶ 17; Doc. 3-2, PageID 21. These prohibitions are difficult to describe as anything other than a duty to "maintain [TurboExcel] . . . in utmost secrecy." *Novus*, 74 F.4th at 428. So a confidential relationship seemingly existed between the parties. And since the SLA effectively conditioned W&S's license to use TurboExcel on its maintenance of the software's secrecy, W&S acquired the alleged trade secret as a result of the confidential relationship.

That leaves the very first prong: existence of a trade secret. Under both DTSA and OUTSA, information can only qualify as a trade secret if it: (1) "derives independent economic value . . . from not being generally known . . . [or] readily ascertainable," and (2) is the subject of "efforts that are reasonable . . . to maintain its secrecy." *James B. Oswald Co. v. Neate*, 98 F.4th 666, 675 (6th Cir. 2024) (quotations omitted). Savvysoft has adequately pleaded both elements. First, it is reasonable to infer from the Complaint's allegations that TurboExcel derives value from not being generally known. Savvysoft describes how TurboExcel "boost[s] productivity and efficiency and . . . sav[es] thousands of man-hours . . . and hundreds of thousands of dollars" for its users. Doc. 3, ¶ 18. Accepting the truth of those assertions, it is easy to infer that the information constituting TurboExcel derives value in

great part from its being nonobvious. If it was obvious, Savvysoft's competitors could "engineer [a TurboExcel clone] and entice customers with a competing product." *dmarcian, Inc. v. dmarcian Europe BV*, 60 F.4th 119, 141 (4th Cir. 2023) (holding that a company's software code derived value from its secrecy because of the possibility of competition). Second, Savvysoft has pleaded reasonable steps to maintain the Runtime Files' secrecy. As described above, the SLA restricted distribution of the Runtime Files. Doc. 3, ¶¶ 16–17; Doc. 3-2, PageID 21. On top of that, Savvysoft brought this lawsuit when the prohibited use continued. *See Cincom Sys., Inc. v. LabWare, Inc.*, No. 1:20-cv-83, 2021 WL 675437, at *3 (S.D. Ohio Feb. 22, 2021) (holding that software licensing requirements and enforcement actions showed sufficient efforts to maintain secrecy to survive a motion to dismiss).

W&S principally challenges the conclusion as to the first prong—whether the alleged information constitutes a trade secret. Doc. 13, PageID 74–76. Its arguments fall into two buckets. First, it questions whether object code *generally* can ever qualify as a trade secret. Second, it argues that TurboExcel's object code *specifically* is not a trade secret because it was not subject to reasonable efforts to maintain its secrecy. Both arguments fail.

The Court finds no reason to exclude object code, as a class, from the ambit of trade secret protection. According to W&S, "the law is clear that, 'while computer source code is a trade secret, the way it operates is not.'" *Id.* at PageID 74 (quoting *Agency Solutions.Com, LLC v. TriZetto Grp., Inc.*, 819 F.Supp.2d 1001, 1028 (E.D. Cal. 2011)). That is a true statement, as far as it goes. But W&S overextends it to conflate the "way [software] operates" with the software's object code as a matter of law. *See id.* at PageID 75. None of its cited cases support

that proposition. Focus on *Agency Solutions.Com*.[4] The statement above, quoted from that case, centered on a completely different kind of information from object code: a written "Service Manual" that contained "a description of what someone operating the program would experience." *Agency Solutions.Com*, 819 F.Supp.2d at 1027–28. It is that instruction manual that the court referred to as "the way [the program] operates." And it is clear why, when used in that limited sense, "the way [the program] operates" is not a trade secret: it derives no value from being unknown. Indeed, end-user instruction manuals, like the one at issue in *Agency Solutions*, derive much of their value from being open to inspection. But that does not at all mean that the *internal* (and undisclosed) workings of the product that the manual describes are somehow equally public. Though a user may learn "the way [TurboExcel] works" from a non-trade secret user guide (indeed, from the SLA itself), the information constituting the inner workings of the Runtime Files—to the extent it satisfies the DTSA/OUTSA prongs— is a trade secret. *See also Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993) (holding that a software producer "took reasonable precautions" to keep its object code secret such that a "rational jury could conclude" it was a trade secret); *Comput. Scis. Corp. v. Tata*

---

[4] The Court also briefly flags *Silvaco Data Systems v. Intel Corp.*, 184 Cal.App.4th 210 (Cal. Ct. App. 2010). The opinion in that case provides the most comprehensive analysis of the source/object code distinction out of the cases cited by W&S. But it doesn't say what W&S wants it to: namely, that "[object] code may not be a trade secret[] if it is evident to anyone running the finished program." Doc. 13, PageID 75 (quoting *Silvaco*, 184 Cal. App. 4th at 221–22). Rather, it is the "*distinctive characteristics* [of the program]—like improved performance—that cannot constitute trade secrets because they . . . are evident to anyone running the finished program." *Silvaco*, 184 Cal.App.4th at 222 (emphasis added). What *Silvaco* does say about object code is that a defendant's use of object code cannot constitute misappropriation of a "[trade] secret [that] consists of source code." *Silvaco*, 184 Cal.App.4th at 227. In this case, Savvysoft does not allege that W&S misappropriated TurboExcel's *source* code by using its *object* code, but rather that W&S misappropriated the object code itself—an entirely different allegation to which the *Silvaco* court's reasoning does not apply.

*Consultancy Servs. Ltd.*, No. 3:19-cv-970, 2019 WL 2058772, at *3 (N.D. Tex. May 9, 2019) (finding that even a user manual could qualify as a trade secret in circumstances where it *did* derive value from not being generally known).

The Court is also unconvinced by W&S's logic in arguing that Savvysoft did not take reasonable steps to protect its trade secret. Again relying on *Agency Solutions.Com*, W&S argues that TurboExcel does not meet the second DTSA/OUTSA prong because Savvysoft "market[ed] [the software] to its customers, revealing in the process how the program works." Doc. 13, PageID 74 (quoting *Agency Solutions.Com*, 819 F.Supp.2d at 1028) (second modification in original). As a consequence, so the argument goes, the Runtime Files are not a trade secret because "the way the program[] work[s] is public." *Id.* (quoting *Agency Solutions.Com*, 819 F.Supp.2d at 1028) (modifications in original). But marketing a product does not necessarily render the inner workings of the product "public." Moreover, and at risk of undue repetition, *Agency Solutions.Com* dealt with a different type of information entirely: user manuals, not object code. W&S, to be fair, relies on additional authority, pointing out that "the Sixth Circuit has held that a 'marketed product that was sold and freely shared . . . is not a trade secret.'" *Id.* at PageID 75 (quoting *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 643–44 (6th Cir. 2020)). But that holding, again, applied to a different type of information: computing *hardware* that the plaintiff sold without requiring buyers to maintain its secrecy. *ECIMOS*, 971 F.3d at 643. Indeed, that same opinion noted that, at an earlier trial, the jury found that the plaintiff "held a trade secret in [] its software source code." *Id.* at 641. The distinguishing factor between the two commodities in that case was that the hardware was "freely shared," while the software was licensed through an agreement imposing duties of secrecy materially identical to the SLA here. *See id.* at 640, 644 (quoting parties' software

licensing agreement). In other words, it wasn't the plaintiff's *marketing* that made its hardware a non-trade secret, but rather the plaintiff's failure to impose a duty of secrecy on recipients of that hardware, as it did with its software. Since Savvysoft's pleadings demonstrate the SLA's imposition of a robust duty of secrecy on W&S, *see* Doc. 3, ¶ 16, *ECIMOS* does not help W&S's argument.

In sum, construing the Complaint in the light most favorable to Savvysoft and drawing all reasonable inferences in its favor, the Court is convinced that Savvysoft has made a sufficient showing on all three DTSA/OUTSA factors to survive a motion to dismiss.

## IV.    CONCLUSION

For the reasons stated, the Court **DENIES** W&S's Motion to Dismiss All Claims (Doc. 13).

**IT IS SO ORDERED.**

March 3, 2025

Jeffery P. Hopkins
United States District Judge